**Opinion filed February 27, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00253-CV

_____

## IN THE INTEREST OF A.M., L.M., AND M.M., CHILDREN

**On Appeal from the 326th District Court**
**Taylor County, Texas**
**Trial Court Cause No. 11315-CX**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal from an order in which the trial court, based upon the jury's verdict, terminated the parental rights of the mother and father of A.M., L.M., and M.M.[1]  Both parents appealed.  On appeal, each parent challenges the sufficiency of the evidence to support the jury's finding that the termination of their parental rights is in the children's best interest—the mother contests the best interest finding only as to A.M., while the father raises the issue as to all three children.  *See*

---

[1]We use initials to refer to the children.  *See* TEX. R. APP. P. 9.8(b).

TEX. FAM. CODE ANN. § 161.001(b)(2) (West Supp. 2024).[2] We affirm the trial court's order.

*Termination Findings and Standards*

The termination of parental rights must be supported by clear and convincing evidence. FAM. § 161.001(b). To terminate one's parental rights, it must be shown by clear and convincing evidence that the parent has committed one of the acts listed in Section 161.001(b)(1), and that termination is in the best interest of the children. *Id.* Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007 (West 2019).

In this case, the jury and the trial court found that clear and convincing evidence established that the parents: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) were convicted of abandoning or endangering a child under Section 22.041 of the Texas Penal Code and thus held criminally responsible for the serious injury of a child; and (4) knowingly engaged in criminal conduct that resulted in their convictions, imprisonment, and inability to care for the children for not less than two years from the date of filing the petition. *See id.* § 161.001(b)(1)(D), (E), (L)(x), (Q); TEX. PENAL CODE ANN. § 22.041 (West Supp. 2025). The jury and the trial court further found that termination of each parent's parental rights was in the children's best interest. *See* FAM. § 161.001(b)(2).

---

[2]We note that the legislature has amended Section 161.001(b)(1), which resulted in the renumbering of several provisions. *See* Act of May 16, 2025, 89th Leg. R.S. ch. 211, § 2, 2025 Tex. Sess. Law Serv. 573, 574–75. The amendments only apply to suits affecting the parent-child relationship that are pending on or after the effective date of the amendments; thus, we apply the law in effect at the time the suit was pending below. *Id.* § 3.

In reviewing a legal sufficiency challenge, we must decide whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022). Cognizant of the required appellate deference to the factfinder, "we look at all the evidence in the light most favorable to the finding, assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* (internal quotation marks omitted). "However, we may not disregard 'undisputed facts that do not support the finding,'" and the factfinder is "the sole arbiter of the witnesses' credibility and demeanor." *Id.* (first quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); and then quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). As such, when considering the credibility of the evidence presented, we may not substitute our judgment for that of the factfinder. *J.F.-G.*, 627 S.W.3d at 316.

In assessing whether the evidence is factually sufficient, we weigh the disputed evidence that is contrary to the finding against all the evidence that favors the finding. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We give due deference to the finding and determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction about the truth of the allegations against the parent. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002); *In re L.C.C.*, 667 S.W.3d 510, 512 (Tex. App.—Eastland 2023, pet. denied).

With respect to the best interest of the children, no unique set of factors need be proved. *L.C.C.*, 667 S.W.3d at 513; *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). Further, the best interest determination does not restrict the proof to any specific factor or factors. *In re J.S.*, 687 S.W.3d 541, 547 (Tex. App.—Eastland 2024, no pet.). However, courts may use the non-exhaustive

*Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.*

To support a best interest finding, the Texas Department of Family and Protective Services (the Department) is not required to prove each *Holley* factor; in some circumstances, evidence of the presence of only one factor will suffice. *C.H.*, 89 S.W.3d at 27; *In re D.M.*, 452 S.W.3d 462, 473 (Tex. App.—San Antonio 2014, no pet.). And the same evidence that proves one or more statutory grounds for termination may also constitute sufficient, probative evidence illustrating that termination is in the children's best interest. *C.H.*, 89 S.W.3d at 28; *C.J.O.*, 325 S.W.3d at 266.

The absence of evidence of some *Holley* considerations does not preclude the factfinder from reasonably inferring or forming a strong conviction or belief that termination is in the children's best interest, particularly if the evidence indicates that the parent-child relationship and the parent's conduct has endangered the safety and well-being of the children. *C.H.*, 89 S.W.3d at 27. This is so because the best interest analysis evaluates the best interest of the children, not the parent. *J.S.*, 687 S.W.3d at 548; *In re E.C.R.*, 638 S.W.3d 755, 767 (Tex. App.—Amarillo 2021, pet.

4

denied) (citing *In re B.C.S.*, 479 S.W.3d 918, 927 (Tex. App.—El Paso 2015, no pet.)).

In this regard, the factfinder may measure a parent's future conduct by his or her past conduct in determining whether termination of a parent's parental rights is in the children's best interest. *J.S.*, 687 S.W.3d at 548; *In re Z.R.M.*, 665 S.W.3d 825, 829 (Tex. App.—San Antonio 2023, pet. denied); *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.). The factfinder may infer that a parent's past conduct that endangered the safety and well-being of the children may recur in the future if the children are returned to the possession of the parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.); *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi–Edinburg 1992, writ denied). Additionally, the factfinder may infer from a parent's past inability to meet the children's physical and emotional needs an inability or unwillingness by the parent to meet the children's physical and emotional needs in the future. *J.D.*, 436 S.W.3d at 118; *see also In re A.S.*, No. 11-16-00293-CV, 2017 WL 1275614, at *3 (Tex. App.—Eastland Mar. 31, 2017, no pet.) (mem. op.).

*The Evidence Presented at Trial*

M.M. was born on January 6, 2024. Eleven-year-old A.M., nine-year-old L.M., the parents, and the father's other child were living in a motel room.[3] On January 25, 2024, when M.M. was nineteen days old, the parents were pulled over in a vehicle with two other adults and M.M. In the vehicle, law enforcement observed fentanyl, burnt foil, and straws used to smoke the fentanyl. Following the parents' arrest for possession of a controlled substance and paraphernalia, law enforcement notified the Department. Law enforcement searched the family's motel room and found more fentanyl, straws, and burnt foil.

---

[3]The father had a son with another woman in 2018. This child was living with the family when the Department intervened. That child was not a subject of the underlying termination proceeding.

Department Investigator Kaitlyn Bristow observed that A.M. and L.M. were "overly dirty" and it appeared that their clothes had not been washed. She was also alarmed when she noticed that M.M. "would try to breathe really hard," then "would stop breathing and start gasping for air again." Bristow noted that "[i]t was almost like she had sleep apnea." Because both parents were arrested and had no safe alternative caregivers, the Department took custody of the children. *See* FAM. § 262.104 (authorizing the Department to take possession of a child without a court order when the parent's current use of a controlled substance "constitutes an immediate danger to the physical health or safety of the child").

L.M. and M.M. were placed in a foster home in Breckenridge and remained there while the case was pending. The Department had difficulty finding a foster home for A.M. due to his "significant behaviors," including verbal and physical aggression. A.M. spent a month in a shelter before he was moved to a group home in Brownwood. At the group home, he had mentors, counselors, and case managers to provide treatment plans specifically tailored to his needs.

The mother admitted to police on January 25 and on February 12 that she blew fentanyl smoke into M.M.'s face. The parents were charged by four-count indictments—one count for each child in their care at the time—with abandoning or endangering a child. *See* PENAL § 22.041. Specifically, the indictments alleged that the parents engaged in conduct that placed each child in imminent danger "by smoking [f]entanyl or permitting the smoking of [f]entanyl in the child's presence."

The parents remained confined in the Taylor County Jail until they were convicted and sentenced to terms of imprisonment—the mother pleaded guilty in May 2024 and was sentenced to four years imprisonment. The father likewise pleaded guilty to endangering a child in September 2024, and was sentenced to confinement in a state jail facility for twelve months. In February 2025, the father

6

was convicted in the U.S. District Court for the Northern District of Texas, Abilene Division, of conspiracy to distribute and to possess with intent to distribute fentanyl. *See* 21 U.S.C. §§ 841, 846. He was sentenced to imprisonment for ninety-six months in the Federal Bureau of Prisons, to run concurrently with his conviction for child endangerment.

When Bristow visited the parents in jail, the father denied the allegations and refused to continue speaking with her without a lawyer present. The mother likewise denied blowing fentanyl smoke into M.M.'s face; she explained that although she smoked fentanyl while holding M.M. in a baby carrier, she covered M.M. with a cloth and "didn't think the fentanyl smoke would get to [M.M.] through that."

The children were drug tested soon after removal; L.M.'s results were negative, but A.M. and M.M. tested positive for methamphetamine. M.M. also tested positive for fentanyl. When the parents were drug tested in February 2024, the father tested positive for methamphetamine and fentanyl, and the mother tested positive for fentanyl. The mother told Bristow that when she and the father smoked fentanyl, they would send A.M. and L.M. into the adjoining motel room where the children's paternal grandmother lived. She attributed the children's methamphetamine exposure to the father's use and speculated that M.M. tested positive due to skin-to-skin contact with the father. According to the mother, A.M. tested positive because he "was always with [the father]."

The final termination trial commenced before a jury on July 8, 2025, and concluded on July 11. The mother was brought from prison to appear at trial, and the father participated remotely from the federal prison facility in Bastrop. The Department presented the testimony of Bristow, permanency case managers Justin Uphill and Ethan Pfrimmer, L.M.'s and M.M.'s foster father, and Linda Gabriel, the

7

children's Court Appointed Special Advocate (CASA). The mother testified as the Department's sixth and final witness.

The mother told the jury that she and the father have had an "on and off" relationship for nearly fifteen years, and that his infidelity and physical abuse began around 2014. She recounted an incident when she was nine months pregnant with M.M.; the father thought the mother stole his pills, so he hit her on the head, choked her against the wall, then threw her against the toilet. It was only when L.M. came into the motel room and begged the father to stop that he did so.

The mother surmised that the father's fentanyl use started in 2019 while he was living with his other child's mother. The mother began using fentanyl in late 2020 or early 2021 when the father "introduced [her] to it." According to the mother, the father "wasn't home a lot of the time[]," so she had no knowledge that he was dealing fentanyl. She stopped using fentanyl for approximately six months upon learning that she was pregnant with M.M., but resumed after giving birth because she "was in a lot of pain."

When questioned about the events leading up to her arrest, the mother testified that the father "had one fentanyl pill on him and there was a bag of fentanyl that was on top of the baby's diaper bag." She and the father had smoked fentanyl in their motel room earlier that day—they typically smoked "[a] few times a day . . . in the bathroom." Because she was under the influence when she was arrested, the mother purportedly did not recall admitting that she and the father blew fentanyl smoke into M.M.'s face. Even when confronted with her recorded statements to police, she denied the allegations.

The mother testified that neither she nor the father left drugs in areas accessible to the children. And she claimed that neither she nor the father used drugs in front of the children, who "were always in the other room with their grandmother"

while they smoked fentanyl in the bathroom. The children's paternal grandmother, a retired nurse who lived in the adjoining room, had been paying for the family to live at the motel. The mother had not been employed in the five months leading up to her arrest but previously worked in the fast-food industry. The father also held various jobs in fast food restaurants as well as construction.

The jury heard about each child's struggles and specialized needs after removal. M.M. "had very bad acid reflux" due to a dairy allergy, and her developmental delays required occupational therapy. When she was about a month old, her foster parents took her to the hospital because "[s]he sounded very, very congested. . . . Like she couldn't breath[e]." She was hospitalized for a week after being diagnosed with failure to thrive. The foster parents switched M.M.'s baby formula and she was prescribed medication by a gastroenterologist. For the next three months, the foster mother stayed awake at night to monitor M.M.'s breathing while she slept. By the time of trial, M.M. no longer needed her medication, was walking, and was "starting to say a few words."

The foster parents proactively addressed L.M.'s needs as well. They took L.M. to Cook Children's Medical Center to discuss treatment options for her physical abnormality in her lower arms that limits the rotation of her hands. They learned that L.M. had been evaluated eight years prior, but the parents missed all follow-up appointments for treatment. L.M. was also diagnosed with high functioning autism, ADHD, depression, anxiety disorder, and a possible learning disability. Since participating in group therapy, individual therapy, and behavioral therapy, L.M.'s grades, social skills, and self-esteem improved. Because L.M. had "improved dramatically in school," it was no longer believed that she has a learning disability. The foster father recalled how timid and withdrawn L.M. was when she arrived, and how his wife spent two hours combing the knots out of L.M.'s hair.

Uphill testified that both M.M. and L.M. appear "very comfortable" in their foster home and have bonded with their foster parents, who hope to adopt them. The girls have their own rooms, toys, activities, and love the dogs in the home. L.M. told Uphill that she feels safe there, "like she can be herself" and "can do things that she wants to do." Similarly, Pfrimmer told the jury that L.M. has "been very social and very comfortable in the home," and is "very much attached" to her foster parents. M.M. was also described as being "very connected" and "extremely close" to her foster parents. Gabriel observed that M.M.'s foster mother "is her person." The mother agreed that the girls should remain in their foster home because "they are the only parents that [M.M.] knows," and "[t]hey have had a good life that [she] could not provide to them."

A.M., who was twelve years old at the time of trial, also had multiple diagnoses when he came into the Department's care. According to Uphill, the services he received in the group home "seemed to be helping" him. "[H]e started to calm down" and regulate his mood with the counseling, mental health management, and medication management.

However, he regressed when he moved in with his maternal grandmother, C.R., in November 2024. "He was very defiant" and refused to go to school. C.R. was also worried about A.M.'s depression and anger, but he refused to engage with his psychiatrist or therapist. C.R. told Uphill that "she couldn't handle [A.M.'s] behaviors," including punching walls during anger outbursts, and she "actually became fearful of him."

In March 2025, A.M. moved into a residential treatment center where he attended school and received individual therapy, group therapy, and psychiatric services such as medication management. He called C.R. from treatment at least once a week, and they began family therapy sessions with the goal of him returning

10

to her care. It was also the Department's goal to place A.M. with C.R. permanently once his emotional regulation, communication, and school attendance improved. C.R. testified that A.M. "is doing really good right now" and "is very respectful." She agreed that A.M. thrives with structure and does very poorly without it.

Following the jury's verdict, the trial court issued its order terminating each parent's parental rights to the children under Section 161.001(b)(1)(D), (E), (L)(x), and (Q), and found termination to be in the best interest of the children. *See* FAM. § 161.001(b)(1)(D), (E), (L)(x), (Q), (b)(2). This appeal followed.

## *Best Interest of the Children*

Each parent challenges the legal and factual sufficiency of the evidence to support the jury's finding that termination of his or her parental rights is in the best interest of the children. While the father challenges the jury's best interest findings as to all three children, the mother does not dispute that terminating her parental rights to L.M. and M.M. was in their best interest. We will address the parents' appellate issues together.

"'[B]est interest' is a term of art encompassing a much broader, facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 (Tex. 2013) (quoting *Holley*, 544 S.W.2d at 371–72). We reiterate that the trial court, as the trier of fact, is the sole judge of the witnesses' credibility. *J.F.-G.*, 627 S.W.3d at 312. We are not at liberty to disturb the determinations of the factfinder so long as those determinations are not unreasonable. *Id.* at 311–12; *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Giving the requisite due deference to the trier of fact, we hold that, based on the evidence in the record and the application of the *Holley* factors, the jury could have formed a firm belief or conviction that termination of each parent's parental rights was in the best interest of the children. *See Holley*, 544 S.W.2d at 371–72.

Evidence of each *Holley* factor is not required to support a best interest finding. *In re S.R.*, 452 S.W.3d 351, 366 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re S.O.*, No. 05-22-01019-CV, 2023 WL 2237084, at *11 (Tex. App.—Dallas Feb. 27, 2023, no pet.) (mem. op.). In other words, the absence of evidence regarding some of these factors does not preclude a best interest finding, "particularly if [the] undisputed evidence shows the parental relationship endangered the child's safety." *In re N.T.*, 474 S.W.3d 465, 477 (Tex. App.—Dallas 2015, no pet.) (quoting *In re A.E.*, No. 05-14-01340-CV, 2015 WL 1184179, at *6 (Tex. App.—Dallas Mar. 16, 2015, pet. denied) (mem. op.)). Consequently, "evidence relating to one single factor may be adequate in a particular situation to support a finding that termination is in the best interest[] of the child." *J.S.*, 687 S.W.3d at 552 (quoting *In re K.S.*, 420 S.W.3d 852, 855 (Tex. App.—Texarkana 2014, no pet.)). And evidence that is relevant to Section 161.001(b)(1) termination grounds may be probative of a child's best interest. *See In re E.C.R.*, 402 S.W.3d 239, 249–50 (Tex. 2013) (citing *C.H.*, 89 S.W.3d at 28).

Neither parent challenges the jury's and the trial court's findings that they endangered the children as set forth in Section 161.001(b)(1)(D) and (E). Likewise uncontested on appeal are the jury's and the trial court's findings that each parent was convicted of abandoning or endangering a child under Section 22.041 of the Penal Code, and that their criminal convictions resulted in their imprisonment and inability to care for the children for at least two years from when the Department initiated suit. *See* FAM. § 161.001(b)(1)(L)(x), (Q). So long as the evidence supports those findings, they are valid grounds for termination. *See E.C.R.*, 402 S.W.3d at 249–50; *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003); *J.S.*, 687 S.W.3d at 552. In this regard, the evidence that each parent endangered their children and engaged in criminal conduct that resulted in their incarceration could be considered by the

factfinder in determining whether termination was in the children's best interest. *See E.C.R.*, 402 S.W.3d at 249–50; *In re C.J.O.*, 325 S.W.3d at 266.

The record demonstrates that the parents' endangering conduct was attributable to their daily drug use, which "implicates most of the *Holley* factors." *See In re E.D.*, 682 S.W.3d 595, 607 (Tex. App.—Houston [1st Dist.] 2023, pet. denied). The mother attested to smoking fentanyl multiple times a day while the father used methamphetamine in addition to using and distributing fentanyl. A parent's continuing pattern of drug use can support a best interest finding due to the "attendant risks to employment, housing, and prolonged absence from the children." *In re R.R.A.*, 687 S.W.3d 269, 279–281 (Tex. 2024); *see also In re J.A.R.*, 696 S.W.3d 245, 257 (Tex. App.—Houston [14th Dist.] 2024, pet. denied) (The parents' years of drug use supported the trial court's best interest finding.). Here, such risks were a reality—the parents' drug use and drug-related criminal activity directly resulted in their incarceration and the emergency removal of the children, A.M. and M.M. tested positive for the same illegal drugs used by the parents, and the family had been living in a motel room for over a year.

At trial, the mother accepted responsibility for exposing the children to drugs, but attributed the children's methamphetamine exposure to the father's use. Based on the parents' endangering conduct, they were indicted for and convicted of abandoning or endangering a child. *See* PENAL § 22.041. And the father, a convicted fentanyl dealer, had served about five months of his ninety-six-month sentence by July 2025. Any criminal activity that exposes the parent to the potential for incarceration is relevant to the best interest analysis. *In re S.H.*, No. 01-22-00255-CV, 2022 WL 17254956, at *18 (Tex. App.—Houston [1st Dist.] Nov. 29, 2022, pet. denied) (mem. op.). The mother "guess[ed]" that her projected release date was October 16, 2025. She was denied parole after her first hearing and had just become

eligible again in June 2025. The jury was free to disregard the mother's proffered release date as "barely more than conjecture." *In re C.L.E.E.G.*, 639 S.W.3d 696, 699 (Tex. 2022) (quoting *In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006)).

While the parents were incarcerated for the one and one-half years that the underlying suit was pending, the father sent one letter to the children, and the mother sent two. *See J.F.-G.*, 627 S.W.3d at 314 & n.37, 317–18 (considering evidence of the father's incarceration and resulting absence, his history of dealing drugs, "his choice not to monitor [the child's] safety during his incarceration[,] and his minimal effort to contact [the child]"); *C.H.*, 89 S.W.3d at 28. The father introduced no evidence of his efforts to arrange for the children's care during his incarceration, and there was no indication that the parents made any monetary contributions to assist with the children's care. *See C.L.E.E.G.*, 639 S.W.3d at 700. Even before the parents' arrest, the father's stepmother had been financially supporting the family. Consequently, the parents' incarceration resulted in their prolonged absence from the children's lives and inability to care for the children. *See In re B.D.A.*, 546 S.W.3d 346, 361, 364 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (evidence of father's lengthy imprisonment and lack of efforts to provide a safe environment for his children during his incarceration supported best interest finding).

The parents further demonstrated an unwillingness or inability to meet the children's medical needs and exposed them to domestic violence in the home. *See In re O.E.R.*, 573 S.W.3d 896, 905 (Tex. App.—El Paso 2019, no pet.) ("Physical violence in the home leads to an unstable and unpredictable environment for children."). For example, the parents failed to seek medical attention for M.M.'s breathing and acid reflux that Bristow and the foster parents noticed after a short period. Moreover, L.M. could have been receiving treatment for her physical abnormality eight years earlier had the parents attended her scheduled appointments.

In fact, the parents had just missed a medical appointment for M.M. when they were pulled over and arrested in January 2024. The record therefore discloses several circumstances from which the jury may have reasonably discerned a "pattern of conduct that is inimical to the very idea of child-rearing." *J.F.-G.*, 627 S.W.3d at 316 (quoting *C.H.*, 89 S.W.3d at 28). Accordingly, the parents' acts and omissions indicated that the existing parent-child relationship is not a proper one, which supports the best interest finding. *See Holley*, 544 S.W.2d at 371–72.

Given the child-centered focus of the best interest inquiry, the jury could properly afford great weight to the evidence of the children's improvement since removal. *See J.W.*, 645 S.W.3d at 742. Several witnesses agreed that it would be detrimental to the physical and emotional well-being of L.M. and M.M. to uproot them from their current placement. Even the mother opined that it was in L.M.'s and M.M.'s best interest for her parental rights to be terminated so they can be adopted by their foster parents. And although A.M. was in residential treatment at the time of trial, he and C.R. had been consistently communicating and engaged in family therapy so that A.M. could return to C.R.'s home. Yet, despite the children's desires and bonds that they formed with their respective caregivers, the father proposed placing all three children in a home together in a foster home in Lancaster, Texas. It is clear on this record that removing the children from their safe living situations and leaving them in a state of impermanence and uncertainty would be indisputably detrimental to their physical and emotional well-being. *See Lehman v. Lycoming Cnty. Children's Servs. Agency*, 458 U.S. 502, 513–14 (1982) ("There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain . . . under the care of his parents or foster parents, especially when such uncertainty is prolonged."). The children's close bonds with their current

caregivers and the stability of their placements proposed by the Department support the jury's and the trial court's best interest findings. *See Holley*, 544 S.W.2d at 372.

The mother acknowledges A.M.'s desire to remain in his grandmother's care, but argues on appeal that "there is no indication" that he was in favor of terminating her parental rights. While we do not ignore a child's desires, it is only one factor that we consider in the overall best interest analysis. *See Holley*, 544 S.W.2d at 372; *J.S.*, 687 S.W.3d at 553; *cf. In re F.M.E.A.F.*, 572 S.W.3d 716, 732 (Tex. App.—Houston [14th Dist.] 2019, pet. denied) ("A child's love for a parent cannot be ignored as a reflection of the parent's ability to provide for the child's emotional needs."). Although a child's desires or wishes for residing with a parent is an important consideration in determining the best interest of the child, "it cannot override or outweigh evidence of danger to the child." *F.M.E.A.F.*, 572 S.W.3d at 732. Moreover, a child's expressed preference is not binding on the trier of fact; rather, it is only one factor, among others, that can be considered in determining a child's best interest. FAM. § 153.009(c) (West 2014); *see Hart v. Kozik*, 242 S.W.3d 102, 109 (Tex. App.—Eastland 2007, no pet.) (citing *In re Marriage of Stockett*, 570 S.W.2d 151, 153 (Tex. App.—Amarillo 1978, no writ)). Here, the Department's goal aligned with A.M.'s wishes to live with C.R. Consequently, A.M.'s unknown desire on the issue of the termination of his parents' parental rights does not undermine the evidence supporting the jury's best interest findings.

Equally unavailing is the mother's claim that the Department has no plan for A.M. As set forth above, the Department's primary plan is for A.M. to live with C.R., which would benefit his physical and emotional well-being. In the event that C.R. opts not to care for A.M., the Department's alternative plan is to find an adoptive home for A.M. As Pfrimmer explained, unrelated adoption first requires the termination of the parents' rights to the children. With respect to A.M., Pfrimmer

opined that termination of his parents' parental rights was in his best interest because he could then find "a place where he can stay permanently . . . where he knows for sure that he can be loved" and "won't be moved again." The mother, on the other hand, would rather leave "open the possibility" to eventually assist C.R. in caring for A.M., "assuming that she is clean and stable." The jury was permitted to conclude that the mother's desired outcome would lead to impermanence and uncertainty for A.M. and would therefore not be in his best interest. *See J.A.R.*, 696 S.W.3d at 257 ("Stability and permanence are paramount in the upbringing of children."). The father, like the mother, failed to demonstrate the ability to secure and maintain a safe, stable, drug-free home environment or achieve the permanence and stability that the children need to thrive. Such evidence permits the rational inference that relinquishing the children to either parent's care would again subject them to a life of uncertainty and instability. *See J.W.*, 645 S.W.3d at 742 (considering the parent's unstable and uncertain living situation in upholding the trial court's best interest finding); *In re E.M.*, No. 11-24-00310-CV, 2025 WL 1240792, at *10 (Tex. App.—Eastland Apr. 30, 2025, no pet.) (mem. op.) (citing *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied)).

Upon considering the evidence as it relates to each parent's actions and inactions, the emotional and physical danger to the children now and in the future, the emotional and physical needs of the children now and in the future, each parent's lack of parental abilities and stability, and each parent's criminal conduct and drug use, we hold that the evidence is legally and factually sufficient to support the jury's and the trial court's findings that termination of each parent's parental rights is in the best interest of the children. *See J.W.*, 645 S.W.3d at 741; *Holley*, 544 S.W.2d at 371–72.

Accordingly, we overrule each parent's issues on appeal.

*This Court's Ruling*

We affirm the order of the trial court.

JOHN M. BAILEY

CHIEF JUSTICE

February 27, 2026

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.